Mr. Gresham, whenever you're ready. We're not trying to rush you, obviously, but whenever you're ready, we'd be happy to hear from you. Thank you, Your Honor. May it please the Court, I'm John Gresham, the attorney for the plaintiff. I will note that Ms. Chambers, who wrote the brief, if you had looked, she has gone to the Justice Department, so she is not able to be with the Court today. We're happy to have you in her place. Age has now come to the Court. One issue here, did the District Court judge properly apply the standard that this Court has set out with regard to a motion for summary judgment? I will say that the case I think best describes this Court's position is the Jacobs case at 780 Bedford 562. In this case, the Court made a determination, if one looks at the last page of the decision, where she says that the only reasonable inference is that the plaintiff proceeded with surgery based with an incomplete understanding of Duncan's interpretation of what they call the inoperative T, which was the second T that took place, but goes on in the same sentence to say that plaintiff misread the inoperative T. That is the crux of this case, Your Honors. While there was other questions, how did Dr. Williams come to what we think is the falsehood in this case, certainly the inferences that you can draw, which would require reversal of the District Court's opinion? I had a question about that. Yes. Is it defamatory to say that Dr. Robinson did not have a complete understanding, proceeded with an incomplete understanding of the interoperative TEE? Is it defamatory to say that by itself, or is it false and defamatory, or is it only when it's combined with the statements by Dr. Williams that she had an obligation? My understanding is the evidence indicates there's a dispute between the parties about whether Dr. Robinson had an obligation to confirm there's a severe aortic deficiency before proceeding to surgery. So the dispute's not whether she confirmed it or not. She didn't confirm it was severe, and the parties dispute about whose fault that is, but I thought the crux is not really whether she confirmed it, but whether she had an obligation to confirm it or not. No, that is the Dr. Williams position. Our position is the second part of that statement, misunderstood. Where does that come from? That comes from the day of the surgery all the way through for the next three years, Dr. Williams was saying the following. Dr. Duncan, the anesthesiologist, and Dr. Robinson misread the TEE to say that it was severe. I will give you the cites for that. I believe you. There are cites about him saying they misread it as severe, and she says, well, you know, maybe we didn't even read it at all. Dr. Duncan says he's, you know, there's kind of conflicting evidence about that, but I don't think I'm disagreeing with you. I think I kind of saw the evidence as suggesting that it's defamatory to say someone committed malpractice, and the question's not, you know, did she do X, Y, or Z? It's like, yeah, even if she did, it's not malpractice if she didn't have an obligation to do something different, and so that's why I'm saying the crux is kind of the malpractice question. I'm not accusing you of bringing a malpractice case, but I wondered if it's the inferences to be drawn from his implication that she did something wrong, and then he outright said in his reports at times that she did something wrong. Right, and to some degree, part of the problem is the statements that Dr. Williams continues to make from the date of the surgery through ultimately when he's in front of the North Carolina Medical Board is they read it, and it was false. That didn't occur. They did not read it and first determine that it was severe. That never occurred. He has drawn that, for lack of a better term, from thin air, and he continues to say that Dr. Robinson did that. Now, interestingly enough. I'm sorry. I just want to make sure I understand the argument, so I understand Judge Rushing is referring to this imprint, so to have malpractice, you've got to have a duty, and so there's an inference of obligation, but I understand that's one of your two theories, but your first theory is that Robinson misread the T is necessarily false because she didn't read it at all, and we interpret misread in sort of a medical sense, and so if you misread a T, that's a critique. It might not be malpractice, but that's a critique of your professional competence when, in fact, she never read it at all. Do I understand that those are sort of two different theories? There are, and they become somewhat mixed in the district court's opinion. But your position is that you could prevail on your claim on either ground, that if I claim, so if I call my law clerk in and I say, you misread that precedent, that's a critique of his legal abilities. If I say you misread a T, that's a critique of her abilities. If, in fact, he wasn't the clerk that was working on that case, and I did it publicly and all that, that might be defamatory, even if he had no obligation to read that case or do anything about it. That's one theory, but the second theory is that it's actually fully malpractice because she had the obligation to do it, and she didn't do it, but those are separate. That's correct, and they have gotten somewhat intertwined in this case in a way that I like Judge Rushing's comment because there's evidence from Dr. Robinson and additional evidence in the record that she did not, the expert, Dr., I'm going to mangle his name, also said she did not have the obligation. Now, she did learn of the T information very quickly, the sort of factual background. Before you go to the factual background, just in thinking about these two things, I had a question about how do I, what is the standard on which I evaluate the word misread, right, because we might think of it in a variety of different ways. You do it because of what Dr. Mitchell did, Dr. Williams did. He went out of the surgery and said the two of them read the T as severe, and look what it caused. She had this tornography. He goes to her family and says, these two people misread the T as severe, and that's why you have this scar. I understand that, but what I'm trying to, I guess I'm trying to ask is I might think about misread in two ways, right. One way is like as an exercise of medical judgment, right, so I might read a case in an exercise of my legal judgment or a doctor might read an x-ray or a T, which I understand is somewhat related, and I might, in doing the very use of the word misread implies that I am applying my medical judgment in this context, but I might also think about it in a more colloquial sense, right, that I like misread what was in the newspaper, which does not apply the exercise of professional judgment. Why should I read the former and not the latter? Because of the circumstance. He says they said it was severe, and that caused the patient harm. They exercised their medical judgment to say it was severe when it wasn't. I came in and saw it wasn't, but it was too late. So it is a medical judgment. And is the standard on that, and then I'll let you go back to, I know you wanted to talk more about the factual background, but is it your position that we only need conclude that that is at least one reasonable way to understand that language? Yes. That's the summary judgment point, and then the jury can decide that question ultimately. That is correct. That is an inference that is clearly in the record from which a jury could determine that that was false in a way that satisfies the defamation standard. And the fact that it carries all the way through from that day, it carries through to what he tells the people who deal with issues when there is a lawyer saying you did something wrong. Mr. Gresham. Yes, sir. I'm sorry to interrupt you, but before we leave this district court opinion, I wanted to ask you one question, and what I'm going to ask you about is on page 1693. It's the same page where the district judge draws a conclusion, but she says in her order, although moderate AI was a result of the intraoperative TEE and known to Duncan at the outset, is that a fact viewed in the light most favorable to the nonmoving party, which of course is your client? I believe so, Your Honor, because this is a strange case. You adopt that finding and agree with it?  I may have misunderstood your question, so would you repeat it? My question is, is that fact that she recites a fact that is in your client's favor, that it should be viewed in light of the position that you advocate to support it? Do you agree with it or not agree with it? No, I don't agree with it. Okay, that answers my question. Yes, no, I'm sorry I misunderstood your question, Your Honor. I must not have asked it clearly enough. No, no, no. I'm an old lawyer with a new case, so I may have misheard you. I'm an old lawyer with a new hearing aid. We should get together, Your Honor. So what, just so that I understand your position, why do we, why can we assume from the record that it was not known to Dr. Duncan? What's the evidence that suggests that she did not know? You mean Dr. Robinson? I believe Judge Traxler was asking about whether it was known to Dr. Duncan. It was, Dr. Duncan did the initial T, but then left the operating room. They had Dr. Robinson do the anesthesiology at the same time. The evidence is that Dr. Robinson did not hear what he said when he left, and that the protocol there was typically the anesthesiologist would go to the primary surgeon to tell him what he had learned. He was gone. They have what's called a two-minute timeout that Dr. Gawande from Harvard has put forward, and there was no mention in the two-minute timeout that there was any question about the severity. Also, there is no indication that the defendant knew that there was a separate problem, and that was they were going to have to enlarge the portion where they go in to the heart, and he acknowledges he did not know that. Now very quickly, why was he unaware of this? There is evidence in the record he had never read the initial T. He says that.  He takes Dr. Robinson in and says, it's my fault. I didn't see the initial T, and she, for reasons unknown, taped that short conversation, and it's in the record. So why is he making up this story that the two of them misread the T? He had never read the initial T. That seems startling, given this case, but very quickly, notice that the false statement that these two people misread the T as severe, and he corrected the matter, he carries through, and that goes to the carrier, and in that, Ms. Cook, for East Carolina, tells them that we probably don't want to include Dr. Duncan in this. There are two transmitted to Mal Mutual. I think it is page 1543 of the record, and as a result, she's the one on the hook. When it goes to the medical board, he still is telling this falsehood. Now, how, since the opinion says this, how does that not impact her as a physician and a cardiologist that I have been, has been told since the day of the surgery that I misread the T, and this misread is not in the sense of, as Your Honor has said, it's inconsequential. It was very consequential, and Dr. Williams calls in another surgeon to look at this, in part because he now knows the analyst has a problem which he had never known before. He is covering his back end as much as he can by throwing it on Dr. Robinson. Now, to get back, though, to what really happened, would that have been a, and by the way, that doesn't come out in what goes to the insurance carrier. What comes out is she and Duncan misread the T, but Duncan is still here, and by the way, she didn't know any of this was happening for over a year. East Carolina didn't bring her in to hear what actually happened. Very quickly, what actually happened was she did not get the information about the T until after this tornography, and she immediately went and got the defendant, got Dr. Williams, and I see my initial time is up. I think I saved two minutes, so I'll be back. Thank you, Counsel. Ms. McHenry, we're happy to hear from you whenever you're ready. Thank you. May it please the Court. Laura McHenry from the North Carolina Department of Justice on behalf of Dr. Mark Williams. This Court should affirm the District Court's decision to grant summary judgment in Dr. Williams' favor for three reasons. First, the statement made by Dr. Williams about Dr. Robinson was neither false nor misleading, and therefore cannot be the foundation for a defamation claim. Second- Can you start? I don't want you to get away from the two, but what is the evidence that she medically read the T, that she ever medically read the second T before cutting the patient open? Your Honor, it's a very good question. I think we all are very curious about it, but it's not material to the inquiry before this Court. I just want to make sure I understand. There is no record that suggests that she read the T before she cut the patient open. Correct. There is no evidence that she read or sought a clear understanding of the results of the You can go to second and third. I just want to make sure I understood that point first. Second, there is no genuine issue of material fact. Where there is no dispute as to the material facts, the District Court properly performs its gatekeeping function in declining to send the matter to the jury. And third- Can I interrupt just a sec? Of course. If you agree that she never read them, then the statement is false. Isn't that right? No, Your Honor. And this is an important point that I want to bring to the Court's attention. How can you misread something that you never read? Dr. Williams did not say that Dr. Robinson misread the TEE. I want to point the Court to the actual alleged defamatory statement in the record. It's repeated several times between pages 362 and 367. What Dr. Williams said was that Dr. Robinson failed to recognize the findings on the TEE that showed only moderate aortic insufficiency. So you're saying she can't prove he made the statement she alleges in her complaint? I can direct the Court to where Dr. Robinson gleans that word, misread. Did you understand my question? Perhaps not. Please repeat it. You're saying she can't prove that Dr. Williams made the statement that she alleges that he made in her complaint? Correct. Dr. Robinson cannot prove that Dr. Williams said she misread the TEE. Is this in your brief? Your Honor, in preparation for this argument and combing every single page of the record, this was something I really was trying to dial in on because it was unclear to me what exactly was the statement. So my brief, Your Honor, responds to the appellant's opening brief and this discussion about whether she misread the TEE or whether she didn't read it at all. And, of course, my argument, which still stands today, is that that distinction is not useful for the Court's inquiry today. I'm looking at the deposition of Mrs. Cook. This is at 1346 of the Joint Appendix. And she says that Dr. Williams told her that Dr. Robinson and Dr. Duncan, that they had misread the TEE and that they had misread it as severe when the patient had only moderate insufficiency. She says yes. So why is that not evidence that he told someone that they misread it? That language is Judy Cook's summary of what happened. But it's evidence that he said it because that's what she says he said. I can concede that point. It's not a transcript, right? She didn't tape it like Dr. Robinson did. But it's evidence. It may not be the best evidence, but it's evidence that he said misread. Yes, Your Honor. I can concede that in her deposition she uses that phraseology. She says he told her that Dr. Robinson misread the TEE. Okay. However, what's critical, I think, to this Court's inquiry is about whether the statement he made was actually false. Well, but you started this conversation by saying she didn't read it at all. And if you don't read it at all, by definition, you can't have misread it. I mean, that's not a complicated story, right? Or please tell me the complicated way that that seeming truism is false. So I think where we need to look, Your Honor, for clarity on that question is this Court's opinion in AIDS Counseling, Testing Services, and Group W Television. Because in that case, this Court explained that precision and exactitude are not the standard when determining whether a statement is true or false in a defamation claim. This Court said that if the gist or the sting of a statement is substantially true, minor inaccuracies will not give rise to a defamation claim. So if I say, Counsel, you severely misread that precedent, right? I'm, like, there's not ambiguity about that, right? Like, you just read it to me. I'm saying that you misread it. It's not actually true here. This is also false, right? So it would be defamatory, right? Because I would say you misread that, right? And it might well be that you misread it. I think you didn't here, right? But you read it. And so you could have misread it. But if instead I said you misread a different case that you've never seen before, right? We know that's false. We don't have to evaluate whether you did or didn't because you didn't read it at all. First, I'll just contest your characterization that that would be defamatory. I don't think that would be injurious to my career professionally. But still, I understand the point. You know, if I publish out to the bar and I say counsel came in and presented argument to this court as an officer of the court and she misread the precedent, right, in doing so, and that that was important to the exercise of her professional judgment, and so as a result her client lost, right, or had his chest cut open, if we want to do the analogy, I think the bar might be interested in that. And I suspect your future employers would be interested that you misrepresented or you misread a precedent to the court to the injury of your client. I don't think we would. I'll tell you, I would not want that accusation leveled at me. If I write an opinion and Judge Rushing responds by saying, you know, the judge misreads the precedent, I take offense at that because, you know, if I'm doing that, then either it means that I'm not very good at my job or that I'm dishonest, neither of which seem like very good things to be said. And here Dr. Robinson asserts that she didn't misread the TE because she didn't read it at all. And so Dr. Williams' response, our argument in response to that, is that whether she misread it or misunderstood it or made no attempt at all to read it, the gist or the sting of the statement that she failed to recognize the findings of the TEE, showing that the aortic insufficiency was only moderate, is true. Well, that's when you get to the second theory that we discussed with your colleague, which is that the sting is not just that she didn't do it, but that she had an obligation to do it, that she didn't do something that she was supposed to do. She didn't live up to the medical standard. And in reading what Dr. Williams wrote, that seems to be what he is saying. He says she was required to confirm it was severe and she didn't. So why are those statements not false and defamatory? Or at least read in the light most favorable to her. She has an expert saying she didn't have to do that. That's not the medical standard. Why is that theory not viable? Because Dr. Robinson is the only surgeon in the room holding a knife. She has conceded, she has admitted that the results of the TEE can be a contraindication to surgery, to proceeding with the planned operation. There are a number of sites in the record about the timeout. As we know, there's the purpose of... But she and an expert say, yeah, you know, it can indicate, it can show contraindications. Like here it showed not only that it was moderate, but that there were other reasons not to even perform the surgery at all, not to schedule it. But she and the expert also say it's standard of care to proceed with the surgery without checking because these sorts of things don't usually change overnight. And, you know, this is the way it's done. We proceed without, you're not required to confirm that it is, in fact, severe. And so that's evidence. Well, during Dr. Robinson's deposition, when pressed on this question, she admits that the purpose of the timeout is to make sure there are no contraindications to proceeding with surgery. Contraindications can include the wrong patient. It can mean we don't have the correct equipment here in the operating room. We don't have blood available. The instruments are not sterile. The appropriate imaging is not displayed. Those examples that I just gave are all in the record in pages 103, 112, 507, and 575. She admits that a possible contraindication may be the results of the TEE. She also says that if she had known the TEE showed only moderate and not severe aortic insufficiency, that she would have stopped and called Dr. Williams. Not only that she would have stopped, but that she was required to stop and consult with him. But that doesn't answer what I was just talking about. You can say, you know, if I knew that it wasn't severe, I would have called Dr. Williams and said, hey, why are we doing surgery on someone who is not severe? But it can also be true at the same time that I wasn't required to confirm it was severe before I've conducted surgery because we know someone else has already looked at it and confirmed it and these things don't change overnight. And she has an expert, is it Kipson, who also says that this is the standard of care. So, I mean, why is there not a classic dispute here about what she was required to do I don't think the issue is that she wasn't, whether or not she was required to check it. Her contention is that Dr. Duncan was the person who's capable, who's qualified, who's board certified in interpreting the TEEs. And that she says a number of times in her deposition, he didn't tell me. No one spoke up. No one brought it to my attention. So the issue that Dr. Robinson brings to the court is not whether she has the ability or responsibility to read the TEE. The question is that she's, it is her responsibility, I'm sorry, not the question. The fact is, it is her responsibility to confirm that with the cardiac anesthesiologist who's in the room. What's the record that says that that's the only possible conclusion that we can draw? That she has the obligation to confirm. She's got an expert that says that's not true. She says that's not true. So what is the record evidence that tells us that that's the only possible inference? That she has a duty, a medical duty under the standard of care to confirm. That might not be sufficient for you to win, but that would get you somewhere. What's the record to suggest that? Your Honor, I think it's Dr. Robinson's own testimony in this case. It's her own. All right, so where does she say that she has a duty under the medical standard of care to confirm at that point, as opposed to rely on the doctor that said it was severe already based on the first TEE? Where does she say that point is to it? So first I want to clarify where we may not be meeting eye-to-eye here. She's not talking about the duty or the standard of care because this isn't a medical malpractice case, so the record is not going to reflect some of those terms of art that we are expecting in a med mal case or in a medical negligence case. But she does, Your Honor, admit, she does concede that it's her job to confirm there are no contraindications to proceeding with surgery. Well, can I ask you a question? I'm looking at the district court opinion, and the district court opinion said, looking at the testimony and evidence in the light most favorable to Dr. Robinson, said sometime before the timeout, Duncan interpreted the intraoperative TEE and discussed the results with the plaintiff. During this conversation, the plaintiff was never made aware that patient M had moderate AI. So even if she has a duty, why isn't the evidence viewing it in the light most favorable to her such that she did talk to Dr. Duncan about it and discuss the results and was told there was no severe AI? Or was certainly not told there was anything, that it was, certainly was not told it was moderate. So in the joint appendix on pages 112, 117, and 129, I think we'll get the answer to these questions. Yes, there is. Now, you understood what I read you were the findings that the district, the evidence that the district court's pointing to in the light taking it in the light most favorable to her. You understand? This is district court pointing these things out. This is not just some evidence somewhere in the record. And yes, Your Honor. Thank you for that clarification. What I'm directing the court's attention to is the fact that, yes, she, the district court concludes based on the evidence that she was not aware before the sternotomy began, the results of the TEE. That is viewing the evidence in the light most favorable to Dr. Robinson because there is, because Dr. Duncan says he did tell her. In fact, he says that it was so, there was never a question in his mind. It was so obvious and clear. But don't you understand that for us reviewing a summary judgment decision, we don't look at what evidence is on the other side generally unless it's basically uncontroverted. We look at the testimony and evidence most favorable to the non-moving party. And that's what the district court did here. And that's the result you get when you do the job as properly as the district court did, at least in that respect. Yes, if I understand you, I think we're in agreement that what the district court did was view all the evidence in the light most favorable to Dr. Robinson in the most generous fashion it could to Dr. Robinson and still concluded that the statements by Dr. Williams about Dr. Robinson's role in the unnecessary sternotomy were not false. Okay, could I ask you a question about that now that you mention it? Where is the evidence pointed to by the district court to support the opinion that she proceeded to serve with an incomplete understanding of Duncan's interpretation? Where is the evidence that she relies on to make that conclusion? And point to me on the page in her opinion that shows that. Please. Your Honor, that statement, as I understand it, is the inference drawn by the district court in response to the evidence and all inferences in the light most favorable to Dr. Robinson. I know, but I'm looking for what it specifically shows that she had a misunderstanding, an incomplete understanding. Okay, and so I'll redirect you to joint appendix pages 112, 117, and 129. And on those pages, Your Honor, what you'll find is that Dr. Robinson says that she doesn't remember Dr. Duncan telling her that the aortic insufficiency was moderate based on the intraoperative TEE. I think the district court found that he did not tell her that, that the evidence was that he did not tell her it was moderate. Isn't that right? That's correct. That's how the district court viewed the evidence, yes. And so the point is, Dr. Robinson insists that it's not her responsibility to read the TEE, but she admits that it is her responsibility to confirm there are no contraindications to surgery. And so because she also admits that the results of the TEE can serve as a contraindication to surgery, the fact that she proceeded with the sternotomy, she cracked open the chest of a woman without getting an explicit answer from the person in the room. What about the expert report of Dr. Blitz? This is at 458. He says, Acceptable practices for cardiothoracic surgeons performing a valve surgery can range from delaying the chest incision until the TEE is complete and interpreted the results relayed to the surgeon, on the one hand, to, on the other hand, simultaneously proceeding with the chest incision while the TEE is being performed, on the other hand. And any of these practices are well within the standard of care for the cardiothoracic surgeon. That may not be right, but that's evidence that proceeding with the surgery without knowing the TEE results is within the standard of care. That may be true, Your Honor, but that's not the inquiry before this court. It's not about whether she met the standard of care. But they have two theories, right? One theory is it's false and defamatory to say I misread it because I didn't read it. Another theory is it's false and defamatory to say that I engaged in malpractice. It's false and defamatory to say I had an obligation to do something and I didn't do it. I admit I didn't do it, but I had no obligation. Why is that not false and defamatory? Sorry. Because the ‑‑ sorry, I'm looking for a word and it's not coming to me. I know it's natural to want to bootstrap the menmal issue to the defamation, and I don't think we need to, but even if we do, we can. Because she's the only surgeon in the courtroom who's holding a knife and before she makes that first incision, she says that it's her responsibility to confirm that the intraoperative TEE does not provide any contraindication to proceeding with surgery. She failed to recognize ‑‑ she failed to ensure she had a clear understanding of the intraoperative TEE, and therefore the statement by Dr. Williams is not false. Thank you, counsel. Mr. Gresham, you've got a few minutes if you'd like them. I think I'll say two minutes, Your Honor. The question is where did Dr. Williams make the defamatory statement? I will tell you it continued from the day of the surgery to April 14, 2018, when he is writing to the medical board. And he says, when asked how this could have happened, I did respond that the board certified chief of cardiac anesthesia, Duncan, and a board certified cardiology surgeon, Barbara Robinson, failed to recognize the findings of the inoperative TEE. That's on page 639. There are other places, and I'm sorry, rather than just cite the record, I will ask you to take a look at J362, 1639, 1239. It is replete from the day of the surgery. And the last thing that the court needs to know is, remember that Dr. Williams acknowledged to her the day of the surgery that he hadn't looked at the first TEE. But why is that relevant to whether what he said about her is false? I mean, that might be relevant to if somebody is suing him for malpractice, but what does that have to do with this? He's pointing the finger elsewhere. It's him now saying... Like motive for saying something false? But that has nothing to do with whether it's false or not. No, it goes to the motive. And motive is something that, in this case, you can bring out. What is the motive for saying these false things? The motive was he had not done his job. And, by the way, if you look at Dr. Duncan's deposition, he also says she may not have heard me when I made my initial statement about the interoperative TEE because of what's going on in the room. And she states, and there's no evidence to the contrary, that typically when Dr. Duncan leaves, the first thing he does is talk to the chief surgeon. But he didn't do that that day because of the three events. But he ends up being told that he had misread the interoperative TEE to say it was severe, and only Dr. Williams saved the day. Our evidence is she went out and told him what she knew. This is showing it's moderate. He didn't know about the analyst, and he says that's one of the reasons I didn't do the surgery, something he had not discovered. So this is a case for a jury to sort out. There is evidence, clearly, that Dr. Williams can bring, but there is a lot of evidence that Dr. Robinson can bring in this matter. And thank you, Your Honors. Thank you, Mr. Gresham. Ms. McHenry, we certainly appreciate your assistance in the case.
judges: Julius N. Richardson, Allison J. Rushing, William B. Traxler Jr.